**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**PRINCE TOBURAS JERMAINE ROLLE,**

    **Petitioner,**

                                **Case Nos.: 6:17-cr-301-Orl-31GJK**

**v.**                                      **6:09-cr-103-Orl-31GJK**

**UNITED STATES OF AMERICA,**

    **Respondent.**

---

## MOTION TO VACATE, SET ASIDE, OR CORRECT JUDGMENT AND SENTENCE PURSUANT TO 28 U.S.C. § 2255

Prince Toburas Jermaine Rolle, by and through undersigned counsel, hereby respectfully moves this Court pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct the judgment and sentence entered against him on January 8, 2019. *See* Case No. 6:17-cr-301-Orl-31GJK ("2009 Case"), Doc. 141; Case No. 6:09-cr-103-31GJK ("2017 Case"), Doc. 125. Rolle specifically seeks to have his convictions and sentence vacated due to several instances of ineffective assistance of counsel on the part of his trial counsel, Nicole Dickerson.

### PROCEDURAL BACKGROUND

On February 8, 2011, the Honorable District Court Judge Antoon sentenced Mr. Rolle for conspiracy and substantive possession with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. §§841(a)(1), (b)(1)(B), 846, and 2. *See* 2009 Case, Doc. 65 at 2. Judge Antoon imposed 112 months' imprisonment, followed by a 5-year term of supervised release. *Id.* at 2-3. Mr. Rolle's prison term was later reduced under 18 U.S.C. § 3582(c)(2) to 96 months. Doc. 90.

1

While serving his 5-year term of federal supervision, Mr. Rolle was arrested by state authorities for new criminal conduct allegedly stemming from contact with the Orlando Police Department's "TAC" unit on September 27, 2017. Doc. 152 at 3-4. Mr. Rolle's initial appearance on the federal violation of supervised release was held on October 31, 2017; the preliminary examination and detention hearings were held on November 2 and 7, 2017. Docs. 152, 116, 118. The magistrate judge found probable cause for the violations and detained Mr. Rolle. Docs. 111, 112.

Just before being retained by Mr. Rolle in his federal violation of supervised release case, Ms. Nicole Blair Dickerson was also detained by Orlando Police Department's TAC unit after she resisted at a traffic stop. *See* Orange County Case No. 48-2017-MM-9328-A-O ("Dickerson Criminal Case"), Criminal Complaint.[1] On October 7, 2017, TAC unit Officers Stanley Avignon and Landon Thomas stopped Ms. Dickerson for speeding, driving a vehicle with an expired tag, and driving with a suspended license. *Id.* at 2. Ms. Dickerson repeatedly refused to roll down her window for Officer Thomas, and Officer Avignon ordered her to step out of the vehicle. *Id.* Ms. Dickerson told the officers she was a defense attorney and knew her rights; she refused many verbal commands to get out of her vehicle. *Id.* As the officers removed Ms. Dickerson from her vehicle, she made statements such as "you guys get me clients," "do you need me to help spell your reports." And "I make way more money than you." *Id.* Ms. Dickerson continued to actively try to pull away from the officers, and made additional comments, including "I would love to get some of OPD's money." *Id.* at 3. TAC unit Sergeant Whited was advised of the incident. *Id.*

---

[1] Five documents cited from the Dickerson Criminal Case are attached to this Motion as Addendum A. Mr. Rolle respectfully asks this Court to take judicial notice of the documents *See United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts."); *see also Dickerson v. State of Ala.*, 667 F.2d 1364, 1368 (11th Cir. 1982) (relying "on this Court's inherent equitable powers to supplement the record").

On November 2, 2017, while Ms. Dickerson represented Mr. Rolle in his preliminary examination hearing, she was formally charged by the State of Florida in Orange County Case No. 48-2017-MM-9328-A-O for resisting arrest without violence. *See* Dickerson Criminal Case, Information. On December 20, 2017, a federal grand jury returned a two-count indictment against Mr. Rolle for his alleged criminal conduct stemming from contact with the TAC unit, charging that he possessed with intent to distribute a mixture and substance containing fentanyl, and possessed a firearm and ammunition after having been previously convicted of a felony, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(c) and 18 U.S.C. §§ 922(g)(1) and 924(a)(2). *See* Case 2017, Doc. 1. Having retained Ms. Dickerson on his violation of supervised release case, Mr. Rolle also retained her to represent him on his new case and entered a plea of not guilty. Doc. 151.

In February 2018, Ms. Dickerson failed to appear on behalf of Mr. Rolle for a status conference in the trial case before the Honorable District Court Judge Presnell. Doc. 156. On March 8 and 9, 2018, Ms. Dickerson was the defendant in her own trial. *See* Dickerson Criminal Case, Criminal Trial Minutes. Orlando Police Department TAC unit Officers Avignon and Thomas testified against Ms. Dickerson, and she was convicted of resisting arrest without violence. *Id*. The state judge imposed a 10-day suspended sentence with 2 days already served, 100 community service hours, and ordered Ms. Dickerson to write an apology letter to both officers. *See* Dickerson Criminal Case, Order of Disposition. Four days later, Ms. Dickerson appeared in federal district court on behalf of Mr. Rolle, asked for a trial date in April, but advised Judge Presnell that a guilty plea was likely. *See* 2017 Case, Doc. 145.

No guilty plea was set, and no pretrial motions were filed before the first trial. The government's witness list included TAC unit Sergeant Whited. Doc. 34. On the morning of trial, Mr. Rolle's counsel asked for a continuance, "apologized for the untimeliness of the motion," and

cited late discovery disclosures by the government. Doc. 147 at 5. After a long discussion with the parties, this Court expressed irritation that the case was not ready for trial. *Id*. at 19. This Court stated that he was "not happy about it," and excused the jury pool, explaining that "this may be the first time in 17 years I've had to excuse a jury because of a continuance being granted on the day of trial." *Id*. at 19, 21. Before choosing a new trial date, this Court told the defense:

> The plea deadline in this case has expired, so Mr. Rolle has a constitutional right to plead, but I will not accept a plea agreement at this point. I'm done with that. So we're going to try this case or you plead straight up, and hopefully no more excuses.

*Id.* at 22.

Again, no guilty plea was set, and no pretrial motions were filed. The first trial was held in May 2017. *See* Docs. 53, 55, 57. On the second day of trial, Ms. Dickerson failed to appear:

> Let the record reflect we tried to call Ms. Dickerson, and her voice mailbox is full, and we were unable to leave a message. So here we all sit and wait.
> Doc. 55. At 5.

Ms. Dickerson arrived about 12 minutes later, and this Court stated that "a total of about 21 people have spent the last 15 minutes here waiting for your arrival," and "unless you have a very good excuse, I'm going to find you in contempt and impose a sanction, but we'll talk about that later." *Id*. at 6. Ms. Dickerson apologized, and the court imposed no sanction. This Court declared a mistrial after the jury failed to reach a verdict. Doc. 50.

The Second trial was held in June 2017. *See* Docs. 81, 83, 85, 87. Prior to the second trial, no pretrial motions were filed. The government's witness list again included TAC unit Sergeant Whited. Doc. 59. The defense's witness list comprised 26 people, almost all law enforcement, including TAC unit Officers Avignon and Thomas. Doc. 60.

On the morning of the first day of trial, the government raised questions about the defense's witness list. "There appears to be … more than 20 officers on the defense witness list that have no relevant information to this case, and … [it is] just sort of taking – a huge amount of the Orlando

Police Department out of duty for a period of a trial." Doc. 81 at 6. Ms. Dickerson responded that "it will only add about 30 minutes to the case," "[t]he officers … did have some involvement," and "they're not just sitting here for three days." *Id*. at 7. The government told this Court that "[s]he's basically subpoenaed every single officer who checked in on the dispatch at some point, many of whom were not even at the scene of this case," which the court agreed "would be an abuse of process." *Id*. at 8. Later that morning, Ms. Dickerson told this Court she had excused 7 of the 26 witnesses. *Id.* at 99. She did not excuse Officers Avignon or Thomas.

On the second day of trial, the government called Sergeant Whited to testify. Doc. 83 at 104-116. The defense called Officer Avignon to testify. *Id*. at 231-234. The record does not reflect that Ms. Dickerson's connection with the Orlando Police Department's TAC Unit, or these specific individuals, was ever brought to the court's attention. At the end of the second trial, this Court declared a mistrial after the jury failed to reach a verdict. Doc. 70.

Mr. Rolle moved for bond in this case pending the third trial, but during the hearing defense counsel withdrew the request so bond could first be sought in the violation case. Docs. 71, 153. Mr. Rolle moved for bond in the violation case, which was denied after a hearing. Case 2009; Docs. 120, 154. On August 14, 2018, Ms. Dickerson failed to appear for Mr. Rolle's status hearing. 2017 Case, Doc. 158. This Court reached her by telephone:

> You're making a habit of not appearing or appearing late. Is it time for me to start fining you for this?
> Doc. 158 at 5.

Ms. Dickerson apologized, and the third trial was scheduled. *Id.*

The third trial was held in September 2017. *See* Docs. 160, 162, 164. No pretrial motions were filed before the third trial. The government's witness list again included TAC unit Sergeant Whited. Doc. 97, 98. The defense's witness list comprised 28 people, almost all law enforcement,

including TAC unit Officers Avignon and Thomas. Doc. 95. On the morning of the first day of trial, the government raised an issue with the defense witness list again, stating "I just think there is an abuse of process making these officers basically be prisoner here at the courthouse for several days when they have nothing relevant to offer." Doc. 160 at 4. This Court responded:

> Ms. Dickerson, we went through those last time, and I don't understand subpoenaing all these police officers you're not going to call. Unless you've got a good explanation, I'm going to have to start imposing sanctions. You were late again this morning. You've been late before. I overlooked it the last time, but I'm not going to start overlooking this stuff anymore.
> *Id*. at 5.

Ms. Dickerson stated:

> [I]t's the defense's position that all of these officers have information that's relevant to the case. They all responded to the scene. They all took part in locking down the apartment complex where they believed that Prince Rolle was hiding. So these are all officers that the defense believes has relevant information, even if that relevant information is 'We never saw Mr. Rolle.'
> *Id*. at 5-6

This Court cautioned Ms. Dickerson that "unless there's a good reason for having all of these police officers under your subpoena, I'm going to do something about it later." *Id*. at 7.

The parties also discussed the government's investigation into one of the defense witnesses, Mr. Rolle's then-girlfriend Alexandra Charles, for perjury during the first two trials.[2] *Id*. at 5-9. Ms. Dickerson also noted the "thousands and thousands of pages of phone records" disclosed before the third trial related to Ms. Charles's AT&T account, but hired no defense expert and made no motion in limine on those records or the associated cellular tower evidence allegedly placing Mr. Rolle in the area of the crime. *Id*. at 7-8.

---

[2] Ms. Charles testified during the first two trials that she met up with Mr. Rolle in the early evening of September 27, 2017, that he told her his rental vehicle had been stolen, and that she persuaded him to report the rental car stolen. Doc. 55 at 171-179; Doc. 83 at 250-261. After the second trial, the government began to investigate what it believed to be a false alibi supported by Ms. Charles's testimony.

On the second morning of trial, this Court fined Ms. Dickerson $100 for being late again.

Doc. 163 at 4; Doc. 110. This Court also noted:

> With respect to the issue of your staff, yesterday afternoon one of the marshalls observed your staff person using your cell phone in the back of the courtroom, and the chief security – courtroom officer was called and attempted to inquire into the matter. It appears as though your assistant was using your cell phone to make personal texts in the courtroom, which is not authorized by my order.
>
> When Officer Perez asked to see the phone, your assistant refused to provide it. When Officer Perez asked for her identification, she refused to provide it. She said she was going back into the courtroom. Officer Perez says, 'No, you're not.' She attempted to forcefully enter the courtroom. She was forcibly stopped by Officer Perez. She then insulted Officer Perez by calling him a 'fucking asshole,' at which point she was escorted from the courthouse and was told she is no longer allowed to enter until I rule otherwise.
>
> I'm not inclined to rule otherwise, Ms. Dickerson, unless you have some good cause.
> Doc. 162 at 4-5.

Ms. Dickerson did not apologize to this Court but stated that she had "addressed this issue" with the employee, and "she won't be coming back for the remainder of this trial." *Id*. at 5.

During the second day of trial, the government called TAC unit Sergeant Whited to testify again. *Id*. at 113-128. The government also introduced evidence and testimony related to the AT&T records and associated cellular service location information, which Ms. Dickerson objected to only on relevance grounds. *Id*. at 192-242; *see also* Doc. 103 (government's exhibit list and attached exhibits). The parties discussed Ms. Charles again, and the government told this Court that "[a]n affidavit has been drafted," and "it's a very real possibility that she will … be arrested on a complaint for perjury" for her testimony during the first two trials. *Id*. at 259-261.

The next day, this Court advised Ms. Charles of two matters: (1) "when you are put under oath to testify, you swear or affirm to tell the truth; and you understand that, if you do not tell the truth, you could be prosecuted for the crime of perjury"; and (2) "if you choose to testify or if you're compelled to testify in this case, that if you're asked any questions, the answers of which

you think might incriminate you, that you have the right under the Fifth Amendment to our Constitution to decline to answer any such questions." Doc. 164 at 62-63. Ms. Charles indicated that she understood, and that she had just learned of the perjury investigation last evening. *Id*. at 63-64. The government told this Court that Ms. Dickerson had known about the perjury investigation for about a week. *Id*. at 65. This Court decided that Ms. Charles still had time to consult with an independent lawyer. *Id*. at 65-66. Ultimately, Ms. Charles was not called to testify during the third trial.

After the government closed its case-in-chief, Ms. Dickerson did not move for a judgment of acquittal under Fed. R. Crim. P. 29. She did, however, call Officer Avignon to testify again. *Id*. at 85-87. The record does not reflect that Ms. Dickerson's connection with the TAC unit was ever brought to this Court's attention. Ms. Dickerson called no defense witnesses or experts to attack cellular tower evidence placing Mr. Rolle near the crime scene. *See* Doc. 104 (defendant's exhibit list and attached exhibits). At the close of the case, defense counsel made no Rule 29 motion to this Court and made no objections to the jury instructions. *See* Doc. 102 (instructions to the jury). The jury returned a guilty verdict on both counts. Doc. 106.

Alarmingly, Mr. Rolle paid Ms. Dickerson to retain an expert to challenge the Government's cell phone records which were introduced in the third trial. Ms. Dickerson collected the money for the expert. However, there is no record of an expert ever being retained by Ms. Dickerson. Ms. Dickerson never listed an expert witness in discovery disclosures. No expert witness was called during the third trial. Mr. Rolle was never consulted or informed about the decision not to utilize an expert witness. Mr. Rolle was not refunded for the payment he made to allow Ms. Dickerson to hire an expert witness and to this day, Mr. Rolle is not aware what his payment was used for.

Four days after the verdict, United States District Court Judge Dalton *sua sponte* issued an Order to Show Cause about "an incident … involving defense attorney Nicole Blair Dickerson and the unauthorized use of Ms. Dickerson's cellphone by an individual sitting in the gallery during Mr. Rolle's jury trial. *See* Case No. 6:13-mc-94-Orl-RBD, Docs. 3, 3-1 (incident report).[3] The Order stated that a "[f]ailure to abide by the Standing Order is a sanctionable offense," and "[t]he Incident Report provides grounds for the imposition of sanctions." *Id.* at 2; *see also* Doc. 3-2 (standing order). Ms. Dickerson was noticed to appear on September 18, 2018, along with her employee, "to show cause why sanctions should not be imposed." *Id*. Ms. Dickerson failed to appear as ordered. Doc. 9. Judge Dalton started criminal contempt proceedings "pursuant to 18 U.S.C. § 401 for: (1) violating the Standing Order; (2) failure to comply with the Court's Order to Show Cause of September 10, 2018 ordering her appearance before the undersigned; and (3) failing to comply with the Order to pay a monetary fine imposed by U.S. District Judge Gregory A. Presnell on September 6, 2018." Doc. 6; *see also* Case No. 6:18-cr-215-RBD-DCI ("Contempt Case"), Doc. 1.[4]

On September 21, 2018, Ms. Dickerson was remanded into state custody for 8 days for failing to complete her 100 community service hours. Dickerson Criminal Case, September 21, 2018 Order. Within a week of her release from custody, she appeared with Mr. Rolle at his final revocation hearing for his violation of supervised release case. 2009 Case, Doc. 156. The magistrate judge took judicial notice of the jury's guilty verdict on two counts of new federal criminal conduct and stated that he would recommend Mr. Rolle be adjudicated guilty of violating

---

[3] Documents cited from this civil contempt case are attached to this Motion as Addendum B. Mr. Rolle respectfully asks this Court to take judicial notice of the documents. *See supra* note 1.
[4] Documents cited from this criminal contempt case are attached to this Motion as Addendum C. Mr. Rolle respectfully requests this Court take judicial notice of the documents. *See supra* note 1.

his supervised release. *Id*. at 4-5. The matter was later consolidated for sentencing alongside the 2017 case.

On November 16, 2018, Ms. Dickerson appeared as the defendant before Judge Dalton for a conference to address the status of potential federal criminal contempt charges. Contempt Case, Doc. 14. At the hearing, the government stated its decision to decline prosecution of the contempt matter, because they could not prove the requisite mental state for the offense. *Id*. at 3-6. This Court asked, "Is it the Government's position that Ms. Dickerson's office is so disorganized, that her failure to instruct her employees was so obvious that you were unable to demonstrate that she had willfully – that she had received notice of the order willfully ignored it?" *Id*. at 6-7. The government responded, "yes, Your Honor." *Id*. at 7.

After hearing from Ms. Dickerson, this Court found "that it does not sound to me like you're qualified to practice in the United States District Court based on your current level of office organization or professionalism." *Id*. at 7-14. The court also shared that it was "not persuaded that you meet the standard that would be required to practice here," and decided to "refer it to the grievance committee." *Id*. at 15. This Court continued:

> I'm concerned that even now the Court doesn't have your attention. I find it, frankly, stupefying that a practicing lawyer who wants to appear in the United States District Court would be so cavalier, first of all, about receiving a fine from the presiding judge at all; secondly, not bothering to, as you say, click on the attachment; not bothering to open your mail; not bothering to pay the fine; attempting to pay the fine and being told it must be paid with cash and then saying either – to yourself, I guess, that you would just get around to it when you next had an opportunity. It's stupefying and unacceptable.
> *Id*.

About 10 days later, Florida's 5th DCA sanctioned Ms. Dickerson. *See* Florida 5th DCA Case No. 5D18-0904, December 10, 2018 Order (executed by Judges Torpy, Lamber, and

Eisnaugle).[5]  The 5th DCA found that Ms. Dickerson had willfully disregarded court orders, failed to represent her clients competently, and lacked candor to the court. *Id.*  Its order outlined a grim pattern of ignoring notices and deadlines, abandoning appellate clients, being untruthful to clients about her neglect, lacking candor to the court about Judge Presnell's sanctions during Mr Rolle's case, and exhibiting a cavalier demeanor about it all. *Id.* The 5th DCA's order was forwarded to the Middle District of Florida and the Florida Bar. *Id.*

Less than a month later, on January 7, 2019, Ms. Dickerson represented Mr. Rolle at his consolidated sentencing hearing for both the 2009 and 2017 cases.  2009 Case, Doc. 159; 2017 Case, Doc. 166.  This Court overruled defense objections to the facts, and the guidelines enhancements for obstruction of justice and reckless endangerment. Doc. 166 at 6-7.  Ms. Dickerson argued for a guidelines departure under U.S.S.G. § 5J1.9 (an upward departure provision[6]), and made no downward variance argument in mitigation of Mr. Rolle's sentence. *Id.* at 9-12.  In the 2017 case, Ms. Dickerson asked for the low-end of the guidelines (210 months), and she left the 2009 case to "the discretion of the court" without argument. *Id.* at 13, 25.  After "struggling to find any mitigation," this Court imposed 210 months' imprisonment followed by a 3-year term of supervised release, and a consecutive 24 months' imprisonment on the violation of supervised release case. *Id.* at 19-21, 26.  Ms. Dickerson made no objections to the sentence of how it was imposed. *Id.* at 22, 27.

Just over a month after Mr. Rolle's sentencing hearing, the grievance committee returned its findings to Judge Dalton, specifically cited Mr. Rolle's case, and recommended "serious sanctions" against Ms. Dickerson. Contempt Case, Doc. 16.  Judge Dalton directed Ms. Dickerson

---

[5] The document cited is attached to this Motion as Addendum D.  Mr. Rolle respectfully asks this Court to take judicial notice of the document. *See supra* note 1.
[6] *United States v. Mogel*, 956 F.2d 1555, 1564 (11th Cir.1992) ("The Commission determined dependence upon criminal activity for a livelihood to be an aggravating factor.").

to respond. Doc. 17 (endorsed order). She failed to do so. On March 8, 2018, Judge Dalton

adopted the report and recommendations of the grievance committee in its entirety, which included

a referral to the Florida Bar, suspension from practice in the Middle District of Florida until 2020,

and the requirement she complete nine conditions before petitioning for reinstatement. Doc. 18.

Mr. Rolle filed a consolidated direct appeal from the judgments and sentence issued in the

2009 and 2017 Cases. Both judgments were affirmed and a mandate was issued March 19, 2020.

Doc. 174. This is Mr. Rolle's timely consolidated motion to vacate, set aside, or correct judgment

and sentence pursuant to 28 U.S.C. § 2255. Mr. Rolle is incarcerated.

## STATEMENT OF THE FACTS

On September 27, 2017, Officers Joel Williams and Travis Ring with Orlando Police

Department's Tactical Anti-Crime ("TAC") unit were driving an unmarked vehicle when they

noticed a blue Hyundai Sonata roll through a stop sign opposite them at an intersection. Doc. 160

at 150; Doc. 164 at 21. The officers claimed they could see the driver's face and that the driver

was not wearing a seatbelt as he made a left-hand turn, despite the Hyundai's dark-tinted side

windows. Doc. 160 at 150-151; Doc. 164 at 22. The officers turned behind the Hyundai, ran the

vehicle tag, and discovered that it was a rental vehicle. Doc. 160 at 12; Doc. 164 at 23. Officers

Williams and Ring did not stop the Hyundai, but called in another TAC unit team equipped with

"StarChase."[7]

TAC unit officers routinely use StarChase, because it "avoids us getting into a high-speed

pursuit, which could ultimately lead to safety issues or danger for the general public with people

---

[7] StarChase is a GPS system installed on the front of a law enforcement officer's vehicle, and deployed through a dart-like projectile that adheres to the back of the target vehicle. The GPS "dart" tags and tracks the target vehicle so law enforcement can remotely track and pursue it without engaging in dangerous high-speed chases. *See* http://yx4.98a.myftpupload.com/wp-content/uploads/2020/04/VMLGen3.pdf (last viewed on June 30, 2019).

fleeing the police and running red lights as well as us having to go high speed in a very unsafe driving pattern." Doc. 53 at 38. Ultimately, "if we try to pull someone over and they don't stop, they take off, they accelerate at a high rate of speed, we don't want to engage in pursuit of them because it's a danger to the public." Doc. 160 at 153.

TAC unit officers Zachary Evans and Jeffrey Staudenmaier responded in a vehicle equipped with StarChase, maneuvered behind the blue Hyundai, and activated police lights and sirens. Doc. 160 at 154; Doc. 164 at 25. The Hyundai did not stop, accelerated away from the police "at a high rate of speed," and Officers Evans and Staudenmaier deployed StarChase. Doc. 160 at 154; Doc. 162 at 84. The TAC unit "let [the Hyundai] go" and watched for the car to "start driving normal speeds." Doc. 160 at 160. When officers "obtained [an] eye" on the Hyundai a few minutes later, it "was not" traveling at a high rate of speed. Doc. 164 at 27. In fact, the Hyundai was "slowing down, stopping at red lights," and "was stuck in traffic, and … observing all traffic laws." Doc. 81 at 128; Doc. 53 at 129.

Once Officers Williams and Ring began to keep a safe distance behind the Hyundai, they observed a backpack being thrown out of the passenger-side window into a field. Doc. 160 at 161; Doc. 164 at 28. Because there were "no neighborhoods over there," the officers pinned the location for another team to recover later. Doc. 160 at 163. Officers Williams and Ring followed the Hyundai into an apartment complex. *Id.* at 164. As the officers entered the parking lot, they observed the Hyundai being parked, and the officers pulled in their vehicle to block the Hyundai. Doc. 160 at 164-165; Doc. 164 at 30. The Hyundai's driver exited the vehicle, looked at the officers, and ran. Doc. 160 at 165; Doc. 164 at 30. Officer Williams chased the driver on foot and watched him discard a cellular phone. Doc. 160 at 166. Officer Williams also found a small black scale in pieces in one of the apartment's breezeways. *Id.* at 168.

Many TAC unit officers either responded by radio to this situation, or came to the scene to help, but no other officers saw the driver, and no suspect was apprehended. *See, e.g.,* Doc. 164 at 85-88 (testimony of defense witness Officer Avignon). A signed contract in the Hyundai identified Prince Rolle as the renter of the vehicle. Doc. 160 at 174; Doc. 164 at 32. Officers pulled up a picture of Mr. Rolle in DAVID, and testified that Mr. Rolle was the driver who has fled. Doc. 160 at 175; Doc. 164 at 32-33.

Meanwhile, Sergeant Whited recovered the discarded backpack, which contained a loaded firearm, and two bags that appeared to contain narcotics. Doc. 162 at 115-119. During Officer Williams's follow-up investigation, he received a tip that led him to recover a YouTube.com video, predating the events of September 27, which allegedly depicted Mr. Rolle wearing the discarded backpack. Doc. 162 at 24; *see also* Docs. 103-31, 103-32, 103-33, 103-34. A warrant was obtained for Mr. Rolle's arrest.

On the evening of September 27, 2017, Mr. Rolle reported to the Orange County Sheriff's Office that his Hyundai rental car had been stolen earlier in the day. Doc. 162 at 139. Deputy Adam Villar wrote a stolen vehicle report the next day. *Id.* at 141. Sometime later, Deputy Villar spoke with the federal probation officer who supervised Mr. Rolle, Julio Dominguez, who was concerned that Mr. Rolle had fabricated the stolen vehicle report. *Id.* at 142. Deputy Villar reviewed the information from the Orlando Police Department and determined that Mr. Rolle had filed a false police report.[8] *Id.* at 143.

Further investigation revealed several facts. First, lab tests confirmed that one of the mixtures and substances contained a detectable amount of fentanyl. Doc. 164 at 11. Second, Alcohol Tobacco and Firearms ("ATF") agents determined that the firearm and ammunition were

---

[8] Mr. Rolle was never charged with filing a false police report.

manufactured outside Florida. Doc. 162 at 254-255. Third, OPD noted that the discard cellular phone was "brand new" and "looked like it had just been picked up from the Verizon store," but found a latent print on the phone, which did not march Mr. Rolle. Doc. 160 at 183; Doc. 162 at 133, 152. Fourth, rental car records reflected that Mr. Rolle had provided the company a phone number of (407) 404-2385 and an e-mail address of Alexis874msn.com when he rented the Hyundai. Doc. 162 at 162, 167-168. Finally, law enforcement revealed that Alexandra Charles was Mr. Rolle's then-girlfriend, and her employment records reflected that she used an email address of Alexis874msn.com, and a phone number of (321) 512-7440. *Id.* at 181. Ms. Charles's AT&T account included both the phone number of (407) 404-2385, and the phone number of (321) 512-7449. *Id.* at 185, 197-198.

During the third trial, the records custodian for AT&T testified that he was unfamiliar with the disclaimers on their historical precision locator information documents. *Id.* at 211-212. There were no exhibits shown to the witness or moved into evidence to explain those disclaimers to the jury. ATF Agent Cecelia Marshall testified that, according to AT&T's cellular tower records, both the phone number of (407) 404-2385, and the phone number of (321) 512-7449, were near the events of September 27, 2017, and not near where Mr. Rolle told Deputy Villar he was when the Hyundai was stolen. *Id.* at 228-238. The government moved two exhibits into evidence created by Agent Marshall depicting the cellular tower location information overlaid on google maps. *Id.* at 224-228; *see also* Docs. 103-37, 103-38. The defense's sole objection to the admissibility of the cellular tower location exhibits was to relevance. This Court overruled the objection and the defense made no other motions and introduced no expert in response to this evidence. Doc. 162 at 227. The government's final witness, Mr. Rolle's probation officer, testified that he had contact

with the defendant at the (407) 4040-2385 phone number. Doc. 164 at 105. The jury returned a guilty verdict on both counts. Doc. 106.

To prepare for sentencing on December 6, 2018, the United States Probation Office issued its final Presentence Report. *See* Doc. 166 (Cited as "PSR" followed by the appropriate paragraph or page number). It correctly noted the 20-year statutory maximum sentence Count One, the narcotics count, and the 10-year statutory maximum for Count Two, the firearm and ammunition count. PSR at 1. Under grouping rules at U.S.S.G. §§ 3D1.2(c) and 3D1.3(d), Count Two and § 2K2.1 drove the guidelines, and the PSR calculated these levels:

- Base Offense Level[9]     24
- Specific Offense Characteristics[10] +4
- Obstruction of Justice[11]   +2
- Reckless Endangerment[12]   +2
- Adjusted Offense Level    32

Using the same priors that established § 2K2.1's base offense level, the PSR also determined that Mr. Rolle was a Career Offender. PSR ¶¶27-28. Because the offense level for the Career Offender guideline was 32, the same as the § 2K2.1 guideline, the total offense level remained 32. PSR ¶30. Similarly, Mr. Rolle's criminal history category was a VI with and without the Career Offender enhancement. PSR ¶¶56-57. The advisory guidelines range was 210-262 months. PSR ¶¶89-90.

---

[9] The PSR determined under § 2K2.1(a)(2) that Mr. Rolle had two qualifying felony convictions: aggravated battery with a deadly weapon (law enforcement officer) (two counts), and federal conspiracy and possession with intent to distribute five grams or more of cocaine base. PSR ¶¶20, 51,53.

[10] The PSR determined under § 2K2.1(b)(6)(B) that Mr. Rolle possessed the firearm in connection with the felony offense of possession with intent to distribute fentanyl (Count One). PSR ¶21.

[11] The PSR determined under § 3C1.1 that "[t]he defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense." PSR ¶25.

[12] The PSR determined under § 3C1.2 that "[t]he defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." PSR ¶24.

The defense made several objections to the PSR: (1) the offense conduct at PSR ¶¶8-10, 12, and 13; (2) the reckless endangerment enhancement at PSR ¶¶13 and 24; and (3) the obstruction of justice enhancement at PSR ¶¶15 and 25. PSR at 31-32. Defense counsel also "submit[ted] that a departure pursuant to U.S.S.G. § 5H1.9 applies in this case," because "the defendant started a legal business and submitted proof of lawfully gained income since his release from incarceration." PSR ¶106. However, "the parties [did] not advise the probation office of any factors which they believe[d] warrant[ed] a sentence outside the advisory range" under 18 U.S.C. § 3553(a)(1)(7). PSR ¶107.

The PSR also noted that Mr. Rolle lost his mother to heart failure in 2014 and has no relationship with his father. PSR ¶70. Mr. Rolle had one deceased half-sibling who passed away in 2007, and two others who are incarcerated. *Id.* Mr. Rolle was partially raised by his grandmother, who died in 1995, and also by his stepfather, who died 15 days before his mother in 2014. PSR ¶71. Mr. Rolle has no family of his own. PSR ¶72.

The PSR also recounts a history of psychological and emotional evaluations during Mr. Rolle's school years. PSR ¶75. He was diagnosed with ADHD and prescribed medication, but also felt his anger was hard to control after his grandmother died when he was 10 years old. PSR ¶76. According to school records, he was also diagnosed with emotional problems, and scored a functioning IQ of 81 in the 10 percentile. PSR ¶82. He was placed in ESE classes, and his reading and math skills never progressed beyond the 4th or low-5th grade level. *Id.* Mr. Rolle completed 527 hours of GED classes during his prior federal prison term, but he has no GED. PSR ¶83.

At sentencing, the defense repeated its objections to the PSR. Doc. 166 at 4. On the reckless endangerment enhancement, the government responded:

> There was testimony in the case that Mr. Rolle sped away from the officers at a high rate of speed. Fortunately, in this case, because of the StarChase deployment,

officers did not have to follow the defendant at that high rate of speed in order to catch up with him. But, in any event, he sped away from them at a high rate of speed, and there was a police chase in this case at least till the time that Mr. Rolle thought he was no longer being followed.
*Id.* at 5.

This Court overruled the objections, and on the reckless endangerment found, "I also think the preponderance of the evidence supports those facts, and accordingly, would support the enhancement for … creating a risk of bodily injury by reason of his fleeing." *Id.* at 7. This Court determined that "the appropriate guidelines score is a 32-VI" and the guidelines range was between 210 and 262 months' imprisonment (capped at 240 months), and acknowledged that "because they do reach the same result … I didn't reach [the Career Offender] issue, but it does appear that Chapter 4 would be applicable and would result in … the same scoring result." *Id.* at 7-8. This Court noted that the probation officer's recommendation was 210 months' imprisonment. *Id.* at 9.

This Court recognized the defense to speak, and counsel "apologize[d] for the untimeliness of the letters that were provided" from Ms. Alexandra Charles and others to support Mr. Rolle. *Id.* at 8. Defense counsel argued for a § 5H1.9 departure "on the basis of Mr. Rolle's lack of reliance upon criminal activity to make a living," describing positive steps he took since being released from federal prison. *Id.* at 9-11. This Court expressed confusion about her argument:

> THE COURT: And, specifically, your downward departure is based on – on what in the guidelines?
> MS DICKERSON: What? In the guidelines?
> THE COURT: Yeah
> MS. DICKERSON: It's – I will –
> THE COURT: Do you have a specific guideline reference that I'm to look to? Because this is – this is new to me in terms of departure, or are you talking about a variance?
> MS. DICKERSON: Can you say that last part again? I didn't hear you.
> THE COURT: Are you asking for a departure or a variance from the guideline score?
> MS. DICKERSON: A departure.
> THE COURT: Okay. Well, I need a specific reference to what – I'm not aware of anything in the

| | |
|---|---|
| | guidelines that suggest an effort to turn your life around is the basis for a departure. |
| MS. DICKERSON: | It is Section 5J1.9, presentation of information regarding departures, and it was – I believe the term was 'lack of reliance upon criminal activity.' |
| THE COURT: | 5H1.9? |
| MS. DICKERSON: | 5H1.9. |
| THE COURT: | 'The degree to which the defendant depends upon criminal activity for a livelihood is relevant in determining the appropriate sentence.' |

*Id.* at 11-12.

The government responded:

[T]he facts suggest that the defendant was depending upon criminal activity for his livelihood. There's no evidence to the contrary. Indeed, we have scales. We have drugs. We have a firearm, tools of the trade of drug dealing. We have distribution amounts of fentanyl and other substances illegal under state law. So it seems that the evidence is that Mr. Rolle was depending upon criminal activity for his livelihood.
*Id.* at 12.

This Court denied the departure and told the defense it would "be happy to hear from you with respect to mitigation and an appropriate sentence." *Id*. at 13. Defense counsel responded, "There's nothing further for the defense. We would ask that the Court sentence Mr. Rolle to the bottom of the applicable guidelines." *Id*. Other than asking the court questions about his Career Offender status, and the guidelines calculations, which he clearly did not understand, Mr. Rolle declined to allocute. *Id*. at 13-16.

After hearing from the government, this Court determined that "from the offense standpoint, we're dealing with a serious matter." *Id.* at 19. This Court also stated, "I'm struggling to find any mitigation here that would – which would cause me to consider a sentence below the guidelines; and, indeed, defense counsel doesn't ask for a variance, merely a low end of the guideline, and I will honor that request. *Id.* at 20. This Court reviewed some of the § 3553(a) factors, stated it had "considered all of the statutory factors," and imposed 210 months' imprisonment consecutive to the violation case. *Id*. at 20-21.

On the violation of supervised release case, this Court determined the guidelines range to be 33-46 months' imprisonment. *Id.* at 24. When asked "what sentence [the court] should impose for the violation … in the 09 case," defense counsel simply told the court, "Your Honor, we would leave the sentence within the discretion of the Court," and asked for a concurrent sentence. *Id.* at 25. The government responded that the district court had already imposed a consecutive sentence in the 2017 case and asked for a low-end 33-month sentence. *Id.* at 25-26. Mr. Rolle again declined to allocate. *Id.* at 26. This Court imposed a 24-month term of prison to close the violation case. *Id.* at 27. The parties did not object to either sentence. *Id.* at 22, 27. The judgments and sentence were affirmed on appeal. A mandate was issued on March 19, 2020. Doc. 174. This motion follows.

## SUMMARY OF THE ARGUMENTS

1.      A criminal defendant is entitled to the "Assistance of Counsel for his defense." U.S. Const. amend. VI. In *United States v. Cronic,* the Supreme Court determined that "[i]f no actual 'Assistance' 'for' the accused's 'defense' is provided, then the constitutional guarantee has been violated." 466 U.S. 648, 654 (1984). The *Cronic* exception provides that "prejudice is to be presumed, and therefore the harmless error rule does not apply, when a criminal defendant has been completely denied the right to counsel for a critical stage of the trial, which is an error that contaminates the entire proceeding." *United States v. Roy*, 855 F.3d 1133, 1144 (11th Cir. 2017) (en banc), *cert denied*, 138 S. Ct. 1279, 200 L. Ed. 2d 475 (2018) (citing *Cronic*, 466 U.S. at 659 & n.25).

The totality of circumstances here shatter the Sixth Amendment's framework for a fair trial and sentencing, and no inquiry into harmlessness could justify or cure the error. During Mr. Rolle's cases, his counsel was untimely, unprofessional, distracted, or just absent. Her judgment

was questionable, if not unethical. This situation falls within the territory of *Cronic*'s presumptively prejudicial structural error – it amounts to a complete denial of counsel, infecting every level of the criminal proceedings to be intrinsically harmful to the criminal justice system. The representation Mr. Rolle received in these two cases is *per se* ineffective, and he is entitled to a new trial, and a new revocation hearing, with new counsel.

2.      Even if this Court finds that the ineffective assistance of counsel in this case does not rise to the *Chronic* standard, there is an abundance of evidence in this case that Mr. Rolle was deprived of his right to effective assistance of counsel. The United States has held that "the benchmark of judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process" that the proceedings cannot be "relied on having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The *Strickland* test is satisfied when a defendant shows that (1) trial counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant enough to deprive him of due process of law. Here, there are several instances where Ms. Dickerson's performance was deficient. Mr. Rolle asserts that had Ms. Dickerson retained an expert to challenge the Government's cell phone record evidence which was introduced for the first time during the third trial, he would have prevailed.

### ARGUMENTS AND CITATIONS OF AUTHORITY

**1.      The totality of the circumstances surrounding Mr. Rolle's trial counsel amount to structural error under *Cronic* and amount to *per se* ineffectiveness of counsel.**

Time and time again, the Supreme Court has stressed the vital nature of the Sixth Amendment right to counsel as the right that preserves all others for a criminal defendant, and ensures the fundamental integrity of the judicial system. *See e.g., United States v. Cronic*, 466 U.S. 548, 656 (1984) ("Without counsel, the right to a trial itself would be 'of little avail,' as this Court

has recognized repeatedly.") (listing cases); *Kaley v. United States*, 571 U.S. 320, 344 (2014) (Roberts, C.J., dissenting) (identifying the right to assistance of counsel as "the most precious right a defendant has, because it is his attorney who will fight for the other rights the defendant enjoys"); *see also Stano v. Dugger*, 921 F.2d 1125, 1170-71 (11th Cir. 1991) (en banc) (Tjoflat, J. dissenting) ("[T]he very integrity of our system – its fairness, its accuracy as a truth-seeking process, and this its ability to accord justice – depends upon effective assistance of counsel."). Briefly, but best stated, "lawyers in criminal courts are necessities, not luxuries." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

Some Sixth Amendment right to counsel violations, "by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988). In *Cronic*, the Supreme Court identified three such situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658-59. The "complete denial of counsel" was the first and "[m]ost obvious" of those presumptively prejudicial errors. *Id.* at 659. The second is when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* Sometimes called the *Cronic* "exception," because its companion case set forth the general rule for requiring cause and prejudice in any ineffective assistance of counsel claim, the structural error doctrine demands *per se* reversal. *Id.* at 666 n.41 (noting that if Cronic chose to "pursue claims based on specified errors made by counsel on remand, they should be evaluated under the standards" pronounced in *Strickland v. Washington*, 466 U.S. 668, 691 (1984)).

Because "[t]he purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial,"

presumptively prejudicial structural errors are not "simply an error in the trial process itself." *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1907-08 (2017) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)) (internal quotations omitted). Instead, this "limited class of fundamental constitutional errors … defy analysis by harmless error standards." *Fulminante*, 499 U.S. at 309 (internal quotations omitted). "Errors of this type are so intrinsically harmful" that they demand a finding of *per se* prejudice. *Neder v. United States*, 527 U.S. 1, 7 (1999). This is because "these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt of innocence … and no criminal punishment may be regarded as fundamentally fair." *Neder*, 527 U.S. at 8-9 (internal citations and quotations omitted).

The totality of circumstances here shatters the Sixth Amendment's framework of a fair trial and sentencing, and no inquiry into harmlessness could justify or cure the error. The very nature of the circumstances precludes any meaningful inquiry. This situation falls within the territory of *Cronic*'s presumptively prejudicial structural error – it amounts to a complete denial of counsel, infecting every level of the criminal proceedings to be intrinsically harmful to the criminal justice system.

The timeline below establishes that during Mr. Rolle's cases, Ms. Dickerson was untimely, unprofessional, distracted, absent, exercised questionable judgment or outright unethical behavior, and invited error during a critical stage. Ms. Dickerson's personal issues began just 10 days after Mr. Rolle's alleged criminal conduct, and her professional problems culminated two months after Mr. Rolle's sentencing hearing. All impacted and contaminated Mr. Rolle's Sixth Amendment right to counsel:

| Date | Event | Impact |
|---|---|---|
| September 27, 2017 | Mr. Rolle's alleged offenses involving OPD TAC Unit | |
| October 7, 2017 | Nicole Dickerson's arrest by OPD TAC unit Officers Stanley Avignon and Landon Thomas, who reported the incident to Sergeant Whited | Distracted |
| October 31, 2017 | Mr. Rolle first appeared in federal court for alleged violations of supervised release arising from the September 27, 2017 incident | |
| November 2, 2017 | Nicole Dickerson appeared on behalf of Mr. Rolle at his preliminary examination for alleged violations of supervised release arising from the September 27, 2017 incident | |
| November 2, 2017 | Nicole Dickerson is formally charged by the State of Florida for resisting arrest without violence against TAC unit Officers Avignon and Thomas | Distracted |
| November 7, 2017 | Continuation of Mr. Rolle's preliminary examination and detention hearing | |
| December 22, 2017 | Mr. Rolle's initial appearance for the 2017 case | |
| February 13, 2018 | Nicole Dickerson fails to appear at Mr. Rolle's status conference | Absent |
| March 8-9, 2018 | Nicole Dickerson's resisting arrest without violence trial where she was found guilty after Officers Avignon and Thomas testified for the state, and the judge imposed an 8-day suspended sentence on the condition she complete 100 hours of community service and write an apology letter to the officers | Distracted |
| March 13, 2018 | Nicole Dickerson advised Judge Presnell and the government that a | Judgment |

| | guilty plea was likely; trial date was set | |
|---|---|---|
| Pretrial #1 | No guilty plea was set; no pretrial motions were filed | Judgment |
| April 21, 2018 | Government listed Sergeant Whited on witness list | |
| April 23, 2018 | Nicole Dickerson moved to continue Mr. Rolle's trial on the morning of jury selection | Untimely |
| Pretrial #1 (continued) | No guilty plea was set; no pretrial motions were filed | Judgment |
| May 29, 2018 | Trial 1, Day 1 | |
| May 30, 2018 | Trial 1, Day 2 Nicole Dickerson was late to trial. Nicole Dickerson threatened with sanctions. | Absent |
| May 31, 2018 | Trial 1, Day 3 Mistrial declared after hung jury | |
| Pretrial # 2 | No pretrial motions were filed | Judgment |
| June 18, 2018 | Government listed Sergeant Whited on witness list | |
| June 18, 2018 | Nicole Dickerson filed a witness list comprising 26 people, almost all law enforcement, including TAC unit Officers Avignon and Thomas | Unprofessional/Unethical |
| June 19, 2018 | Trial 2, Day 1 Court discussed with the parties whether Nicole Dickerson was committing "an abuse of process" to subpoena "every single officer who checked in on the dispatch at some point, many of whom were not even at the scene of this case" Doc. 81 at 6-8. | Unprofessional/Unethical |
| June 20, 2018 | Trial 2, Day 2 | Unethical |

| | | |
|---|---|---|
| | The government called Sergeant Whited to testify, and the defense called Officer Avignon, but the record does not reflect that Ms. Dickerson's connection with the OPD TAC unit, or these specific individuals, was ever brought to the court's attention. Doc. 83 at 104-116, 231-234. | |
| June 21, 2018 | Trial 2, Day 3 | |
| June 22, 2018 | Trial 2, Day 4<br>Mistrial declared after hung jury | |
| June 28, 2018 | Nicole Dickerson withdrew Mr. Rolle's motion for bond in the trial case at the bond hearing | Judgment |
| July 18, 2019 | Nicole Dickerson's motion for bond in the violation case was denied after a hearing | |
| August 14, 2018 | Nicole Dickerson failed to appear at Mr. Rolle's status conference but was reached by phone 21-minutes after court started. | Absent |
| Pretrial #3 | No pretrial motions were filed. Specifically, no motion in limine was filed regarding the "thousands and thousands of pages of phone records" disclosed before the third trial related to Ms. Charles' AT&T account, or the associated cellular tower evidence allegedly placing Mr. Rolle near the crime. Doc. 160 at 7-8. | Judgment |

| | | |
|---|---|---|
| August 30, 2018 | Government listed Sergeant Whited on witness list | |
| August 30, 2018 | Nicole Dickerson filed a witness list comprising 28 people, almost all law enforcement, including TAC unit Officers Avignon and Thomas | Unprofessional/unethical |
| September 4, 2018 | Trial 3, Day 1<br>This Court cautioned Ms. Dickerson that "unless there's a good reason for having all these police officers under your subpoena, I'm going to do something about it later." Doc. 160 at 4-7.<br>The parties also discussed the government's investigation into one of the defense witnesses, Mr. Rolle's then-girlfriend Alexandra Charles, for perjury during the first two trials. *Id*. at 5-9 | Unprofessional/unethical |
| September 5, 2018 | Trial 3, Day 2<br>Nicole Dickerson was 12 minutes late to trial and fined $100. Doc. 162 at 4; Doc. 110.<br>This Court also noted the situation that had occurred on Day 1 after Ms. Dickerson's paralegal had "us[ed] your cel phone to make personal texts in the courtroom," and had been "escorted from the courthouse and was told she is no longer allowed to enter until I rule otherwise." Doc. 162 at 4-5 | Absent/Unprofessional |
| September 6, 2018 | Trial 3, Day 3; verdict<br>This Court advised Ms. Charles of her rights on the perjury investigation and any future testimony, and Ms. Charles noted she had just learned of the perjury investigation the night before even though Ms. Dickerson had been made aware of the investigation at least a week prior. Doc. 164 at 65. | Unprofessional/Unethical/Judgment |

| | | |
|---|---|---|
| | Ms. Dickerson did not move for a judgment of acquittal under Fed. R. Crim. P. 29.<br><br>Ms. Dickerson again called Officer Avignon to testify and again, the record does not reflect that Ms. Dickerson's connection to the witness had been brought to this Court's attention.<br><br>Ms. Dickerson called no defense witnesses or experts on cellular tower evidence placing Mr. Rolle near the crime.<br><br>At the close of the case, defense counsel made no Rule 29 motion to this Court and made no objections to the jury instructions. | |
| September 18, 2018 | Nicole Dickerson failed to appear at her own federal civil contempt hearing | Absent |
| September 21, 2018 | Nicole Dickerson began to serve an 8-day jail sentence for failure to complete the requirements of her suspended sentence | Distracted |
| October 2, 2018 | Mr. Rolle's final revocation hearing took place and the magistrate judge took notice of the guilty verdict and the matter was ultimately consolidated for sentencing alongside the 2017 case | |
| November 16, 2018 | Nicole Dickerson appeared at her federal criminal contempt status hearing, where the government declined to prosecute, but Judge Dalton referred the matter to the MDFL sanctions committee | Distracted |
| December 10, 2018 | Florida's 5th DCA sanctioned Nicole Dickerson and outlined a grim pattern of her ignoring notices and deadlines, abandoning appellate clients, being untruthful to clients about her neglect, lacking candor to the court about Judge Presnell's sanctions during Mr. Rolle's case, and exhibiting a cavalier demeanor about it all. | Distracted/Unethical |

| January 7, 2019 | Mr. Rolle's sentencing hearing for both the trial and violation cases. Ms. Dickerson argued for a guidelines departure provision U.S.S.G. § 5H1.9, and made no downward variance argument in mitigation of Mr. Rolle's sentence. Doc. 166 at 9-12.<br>On the 2017 case, Ms. Dickerson asked for the low-end of the guidelines (210 months), and she left the 2009 case to "the discretion of the court" without argument. *Id.* at 13, 25.<br>After "struggling to find any mitigation," this Court imposed 210 months' imprisonment followed by a 3-year term of supervised release, and a consecutive 24 months' imprisonment on the violation of supervised release case. *Id.* at 19-21, 26.<br>Ms. Dickerson made no objections to the sentence or the manner in which it was imposed. *Id.* at 22, 27. | Invited Error |
| --- | --- | --- |
| February 19, 2019 | MFDL sanctions committee issued their Report & Recommendation, specifically cited Mr. Rolle's case, and recommended "serious sanctions" against Ms. Dickerson | Unethical |
| March 8, 2019 | Judge Dalton adopted the Report & Recommendations of the grievance committee in its entirety, which included a referral to the Florida Bar, suspension from practice in the MDFL until 2020, and the requirement she complete nine conditions before petitioning for reinstatement | Unethical |

The timeline reflects seven distinct categories of circumstances impacting structural error under *Cronic*. First, Ms. Dickerson was untimely when she alerted this Court that Mr. Rolle was likely to plea creating the need for a continuance on the morning of trial. This Court agreed that the case was "not ready for trial," and noted that "I was sort of believing and I assume the Government was led to believe that Mr. Rolle was going to plead, and the decision to go to trial was made at the last minute, which I'm not happy about either." Doc. 147 at 5-19.

Second, Ms. Dickerson was unprofessional when she repeatedly subpoenaed many law enforcement officers not relevant to Mr. Rolle's defense, and never called them as witnesses. This Court repeatedly stated concerns about this abuse of process. *See* Doc. 81 at 6-8; Doc. 160 at 4-7. Ms. Dickerson also allowed her paralegal to violate local rules during trial, and failed to communicate with Ms. Charles, her witness, about pending perjury allegations for almost a week before trial. *See* Doc. 162 at 4-5; 164 at 65. Indeed, at Ms. Dickerson's criminal contempt hearing, this Court found that it did not believe Ms. Dickerson was "qualified to practice in the United States District Court," did not "seem to be particularly remorseful about [her] conduct," and stated that "the level of professionalism and competence that you've displayed up to this point in time is not an acceptable level for a practitioner here in this court." Contempt Case, Doc. 14 at 7-14, 16, 20.

Ms. Dickerson was also continually distracted during Mr. Rolle's cases. Before Mr. Rolle's first trial, she underwent her own criminal trial, conviction, and sentencing. After Mr. Rolle's third trial, she served an 8-day jail sentence. And leading to Mr. Rolle's sentencing hearing, Ms. Dickerson attender her own criminal contempt status conference, and faced sanctions from two separate jurisdictions.

Furthermore, Ms. Dickerson was repeatedly absent or late to Mr. Rolle's status conferences and trials. Even after being fined $100 by this Court for again being late to Mr. Rolle's third trial, which she failed to pay timely, Ms. Dickerson failed to appear at her own civil contempt hearing.

Fifth, Ms. Dickerson's judgment was questionable throughout these proceedings. Before the trials, she filed no pretrial motions, even after "thousands and thousands of pages of phone records" were disclosed before the third trial related to Ms. Charles's AT&T account, and associated cellular tower evidence allegedly placed Mr. Rolle near the crime. Doc. 160 at 7-8. During the third trial, Ms. Dickerson failed to argue a Rule 29 motion, and failed to call a defense expert to rebut the government's new cellular tower evidence.

At times, Ms. Dickerson appears to have behaved unethically by allowing Ms. Charles to allegedly commit perjury for a false alibi during the first two trials, and by failing to alert the court to Ms. Dickerson's own personal conflict of interest with the TAC unit. To date, the record does not reflect that this Court was ever made aware of this conflict, despite the government repeatedly listing and calling Sergeant Whited to testify, and Ms. Dickerson repeatedly listing the officers who arrested her and calling Officer Avignon to testify. This is even more troubling when combing with the "abuse of process" concerns this Court had over Ms. Dickerson's decision to subpoena non-relevant law enforcement witnesses of the TAC unit.

Finally, Ms. Dickerson invited error at a critical stage in the proceedings, Mr. Rolle's sentencing hearing, when she argued an upward departure guidelines provision, litigated no matters under 18 U.S.C. § 3553(a) (despite the PSR's indication that ample mitigation evidence existed), asked for a low-end sentence and deferred an ultimate sentence to the discretion of this Court, and failed to object to either sentence. Two months later, she had been suspended from practicing in the Middle District of Florida and was referred to the Florida Bar. Indeed, during

Mr. Rolle's case (and citing to Mr. Rolle's case), both the state and federal courts dealing with Ms. Dickerson's sanctionable behavior reflect a disturbing patter of ignoring court orders, abandoning clients, being untruthful to clients, lacking candor to the court, and exhibiting a cavalier demeanor about it all.

The Sixth Amendment right to counsel violation here infected every level of the criminal proceedings. The pervasive disrespectful and unprofessional conduct by Ms. Dickerson occurred directly in this case, and indirectly around this case; it is impossible to parse any piece of it from the remainder. The chronology of events is not just disturbing for what Ms. Dickerson did wrong, but what she failed to do. Omissions are the hallmark of structural error. It is not performance, but the absence of performance, and the impossibility of harmlessness review, that should cause this Court to find that the *Cronic* exception applies to this case.

Cases applying the *Cronic* exception are not common. *Cronic* itself was not reversed for *per se* structural error. But courts have recognized the existence of structural error, and it has been applied in limited circumstances under the first two prongs of *Cronic*. *See e.g.*, *Harding v. Davis*, 878 F.2d 1341, 1345 (11th Cir. 1989) (holding that "attorney's silence at the point the verdict was directed against his client was so likely to prejudice Harding that the cost of litigating its effect is unjustified and prejudice presumed")' *Appel v. Horn*, 250 F.3d 203, 214-15 (3d Cir. 2001) (finding constructive denial of counsel where attorneys did not believe they were counsel, conducted no investigation, did not provide the expert or the court with any information about Appel, and did not litigate competency determination in any way); *Tucker v. Day*, 969 F.2d 155, 159 (5th Cir. 1992) (holding prejudice presumed when attorney "did not consult with him, had no knowledge of the facts, and acted as a mere spectator" at the resentencing hearing; *Childress v. Johnson*, 103 F. 3d 1221, 1228-32 (5th Cir. 1997) (applying the *Cronic* presumption when "counsel provided no

meaningful assistance whatsoever, except with respect to the waiver of jury trial"); *Rickman v. Bell*, 131 F.3d 1150, 1155-60 (6th Cir. 1997) (Finding that the constructive denial of counsel where attorney's "performance was so outrageous that it is not necessary for us to decide whether we can impute actual bad faith to him"); *Mitchell v. Mason*, 325 F.3d 732, 741-44 (6th Cir. 2003) (finding that "[w]hen counsel is appointed but never consults with his client and is suspended from practicing law for the month preceding trial, and the court acquiesces in this constructive denial of counsel by ignoring the defendant's repeated requests for assistance, *Cronic* governs").

What happened in Mr. Rolle's cases was comparable, if not more severe, than the cases in which courts have found *Cronic* error. This Court should find that Mr. Rolle experienced a "complete denial of counsel," and that his case was not subjected to "meaningful adversarial testing." *Cronic*, 466 U.S. at 659. No inquiry into harmlessness could justify or cure these errors – the cost of litigating their effect here is unjustified. That is why the *Cronic* exception applies. And that is why this Court should vacate the judgments and sentence of Mr. Rolle.

2.    **The deficient performance of Mr. Rolle's trial counsel satisfies the *Strickland v. Washington* standard for ineffective assistance of counsel.**

A court deciding a claim of ineffective assistance of counsel must judge the reasonableness of counsel's alleged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. "The court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland* at 690.

Under the deficiency prong, the defendant must establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id*. To prove the prejudice prong, the defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 694.

The most obvious example of the prejudice Mr. Rolle suffered due to his counsel in this case is the fact he paid his attorney to hire an expert to counter the testimony of the Government's cell tower expert. The first two trials in this case were substantially the same with no additional evidence and both trials resulted in a hung jury. In the third trial, the Government introduced new evidence purporting to place Mr. Rolle at the scene of the charged offense. Mr. Rolle's counsel did nothing to defend against this new evidence other than objecting based on relevance. Mr. Rolle went into trial having paid for an expert and expecting his expert witness to challenge the Government's interpretation of the cell phone records. No explanation was given to Mr. Rolle to explain the absence of an expert and this time, Mr. Rolle was found guilty.

Additionally, during the third trial, Mr. Rolle lost the testimony of Alexandra Charles. Ms. Charles had testified in the first two trials and shortly before the third trial, the Government made known its intent to charge Ms. Charles for perjury if she repeated the testimony she gave previously during the third trial. Although the record reflects that Ms. Dickerson had known of the Government's perjury investigation for at least a week prior to the third trial, Ms. Charles was not notified of the issue until right before the trial was about to begin. Naturally, Ms. Charles was intimidated and did not have time to consider whether to seek her own counsel and challenge the Government's perjury investigation. Instead, Ms. Charles decided not to participate in the third trial and Mr. Rolle was unable to utilize her as a witness on his behalf. Had Ms. Dickerson promptly notified Ms. Charles of the investigation, Ms. Charles would have been able to seek legal

advice and perhaps continue to testify on Mr. Rolle's behalf. Ms. Dickerson's delay in notifying Ms. Charles thwarted this possibility and ultimately Mr. Rolle suffered as a result.

## CONCLUSION

Ms. Dickerson's performance in representing Mr. Rolle can best be summarized as a calamity of errors. Mr. Rolle was deprived his constitutional right to effective assistance of counsel under both the *Chronic* standard and the *Strickland* standard. Mr. Rolle respectfully requests this Court enter an Order vacating the judgments of conviction and sentence imposed. Additionally, Mr. Rolle requests this Court set an evidentiary hearing to be held to determine the merits of this motion and grant such other relief as this Court may deem just and proper.

The Defendant has read this motion. The Defendant understands the contents of this motion. The Defendant asserts that all of the facts stated herein are true and correct.

**UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.**

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2021 by _____, who is personally known to me or has produced _____ as identification and who did take an oath, and after being first duly sworn according to law deposes and says that the information contained herein is true and correct.

Sworn to or affirmed and subscribed before me this _____ day of _____, 2021

_____          _Prince Rolle_ (signature)
Notary Public                        PRINCE ROLLE


Type of I.D. Produced: _____

35

Respectfully submitted,

_/s/ Joseph E. Zwick_
**JOSEPH E. ZWICK, ESQUIRE**
Mandell Law, P.A.
Florida Bar Number: 0107779
189 South Orange Avenue
Suite 810
Orlando, Florida 32801
Tel: 407-956-1180
Fax: 407-386-9550
Cell: 321-443-9655
jzwick@fightforyou.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, on this _____ day of _____ 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

_/s/ Joseph E. Zwick_
**JOSEPH E. ZWICK, ESQUIRE**
Mandell Law, P.A.
Florida Bar Number: 0107779
189 South Orange Avenue
Suite 810
Orlando, Florida 32801
Tel: 407-956-1180
Fax: 407-386-9550
Cell: 321-443-9655
jzwick@fightforyou.org